No. 86,751

STATE OF KANSAS, *Appellee*, v. SAMUEL MENDEZ, *Appellant*.

66 P.3d 811

Review of the judgment of the Court of Appeals in an unpublished decision filed October 4, 2002. Opinion filed April 18, 2003.

*Rick A. Kittel*, assistant appellant defender, argued the cause and was on the brief for appellant.

*Steven J. Obermeier*, assistant district attorney, argued the cause, and *Paul J. Morrison*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LARSON, J.: In this appeal from the denial of a motion to suppress, we are asked to extend the emergency doctrine to include public service actions by law enforcement officers leading to the discovery of marijuana after an uninvited entry into a residence while taking a 16-year-old boy home in early morning hours after his vehicle had become disabled on Interstate 35 in Johnson County, Kansas.

The facts are not in dispute but are critical to our decision and will be set forth in detail as developed by several different hearings in the case.

It was approximately 1:45 a.m. when Lenexa Police Department Officers Owsley and Schmitz came upon a vehicle with its emergency lights flashing, partially blocking one lane of Interstate 35. The driver was 16-year-old Roberto Mendez, who spoke in broken English. Roberto was on his way to where he was staying after working at a restaurant owned by his brother Israel. He could not provide proof of insurance, and the license plate on the vehicle had expired.

The officers attempted to assist Roberto via their dispatcher in contacting a family member or friend who would assist him. These attempts were not successful. The car was not operational, and arrangements were made to have it towed with Roberto's consent. Without success in the attempts to have someone pick Roberto up, the officers took him to the Lenexa police station where they arrived at approximately 2:20 a.m. Roberto called from the station for someone to take him home but was unable to contact anybody.

Roberto told the officers that he lived in Kansas City, Missouri, with his father who was out of town, so he was staying with an older brother at his apartment. He indicated that his mother lived in the apartment as well. Roberto did not know the address but said the apartment was located behind Blue Valley Northwest High School. The officers decided to take Roberto home.

Roberto gave the officers directions, and they arrived at Bradford Pointe Apartments in the neighboring city of Overland Park. It was a closed-gate community, and Roberto was unable to give the officers the security code to open the gate. A phone number at the gate was relayed to the Lenexa dispatcher who was unable to contact anyone at that number or at Roberto's father in Kansas City, Missouri.

While the officers were communicating with the Lenexa dispatcher, another vehicle arrived and allowed the patrol car to follow it through the gate. Roberto gave the officers directions to the apartment and pointed out his brother's white Lincoln. The officers determined the car was registered to Samuel Mendez.

Owsley testified they walked Roberto to the apartment because they were not sure if he actually lived there. They were also aware there had been no responses from the repeated attempts to contact anyone to assist Roberto. Roberto walked directly to apartment number 3 without any apparent hesitation.

When Roberto reached the apartment, he tapped on the apartment window. Unsuccessful with this, he looked under the floor mat for the house key that Samuel usually left for him. When Roberto turned the handle and pushed the door, he discovered it was unlocked. Roberto pushed open the door and stepped inside. He said, "Sammy, the police are here," as he slightly opened the door.

The officers had not knocked on the door, announced their presence, or made any inquiry as to who lived in the apartment. They simply followed Roberto into the darkened apartment. Owsley admitted that no crime had been committed in his view as he was standing outside the apartment door. He testified that from his vantage point outside the door he did not observe any contraband in plain view when Roberto opened the door. The officers said they did not believe there was any criminal activity going on inside the apartment. The officers did not ask anyone for consent to enter the apartment. They were not invited into the apartment. Owsley testified that the officers "just didn't want to drop off a 16-year-old somewhere where he may not belong."

After entering the apartment, the officers observed a man and woman lying on the floor under a blanket and smelled the odor of marijuana. The man rose to meet the officers and identified himself as Samuel Mendez. While Schmitz talked to Samuel, Owsley looked around the dimly lit room with the aid of his flashlight. He observed a "wad" of money on an entertainment center and a small quantity of marijuana inside a purse on the floor by his feet.

After observing the marijuana, Owsley wished to contact the Overland Park Police Department and asked Samuel for the address. While returning from the kitchen with the address, Samuel partially closed a closet door. This attracted the officers' attention, and they looked inside the closet finding more marijuana. The Overland Park police were called. Samuel was arrested when they arrived. Schmitz and Owsley did not participate in the arrest or

interviews but did assist with Overland Park officers obtaining a search warrant, resulting in the officers finding a triple beam scale and food sealer in the kitchen as well as four wheels in the garage with metal brackets soldered to the interior of the rims and additional marijuana.

Samuel was charged with possession of marijuana with intent to sell and possession of marijuana with no drug tax stamp affixed.

Samuel challenged the Lenexa police officers' entry into his residence as a violation of his constitutional rights under the Fourth Amendment to the United States Constitution and § 15 of the Kansas Constitution Bill of Rights. The trial judge ruled the entry into Samuel's apartment was not a violation of his constitutional rights and denied the motion to suppress the evidence obtained after the officers entered Samuel's residence.

The suppression issue was preserved by objections at trial, where Samuel was found guilty as charged. Samuel appealed.

The Court of Appeals affirmed the trial court's denial of Samuel's motion to suppress the evidence obtained after the officers warrantless entry and subsequent search. The majority found the Lenexa officers were validly exercising their powers as law enforcement officers in returning a teenager to his home in Overland Park in the middle of the night because their actions fell within the spirit of K.S.A. 2002 Supp. 22-2401a(4) and (6). The majority further found the entry into the Overland Park apartment was authorized under the emergency doctrine exception to the Fourth Amendment search warrant requirement.

The dissenting Court of Appeals' judge concluded the evidence was illegally obtained because the officers were acting outside their jurisdiction under the plain language of K.S.A. 2002 Supp. 22-2401a and their entrance into Samuel's apartment was not factually justified by the application of the emergency doctrine exception. We granted Samuel's petition for review.

Samuel raises the same two issues on appeal that were presented to the Court of Appeals. He first argues it was reversible error to allow evidence illegally obtained outside the Lenexa officers' jurisdiction pursuant to K.S.A. 2002 Supp. 22-2401a to be introduced at trial. He further contends that notwithstanding the officers lack

of jurisdiction, they illegally entered his home without a valid search warrant, consent, exigent circumstances, or in accordance with the emergency exception to the warrant requirements of the Fourth Amendment to the United States Constitution and § 15 of the Kansas Constitution Bill of Rights.

Our standard of review for suppression hearings was set forth in *State v. Alvidrez*, 271 Kan. 143, 145, 20 P.3d 1264 (2001), where it was said:

"When reviewing a motion to suppress evidence, an appellate court reviews the factual underpinnings of a district court's decision ' "by a substantial competent evidence standard and the ultimate legal conclusion drawn from those facts by a de novo standard. An appellate court does not reweigh the evidence. The ultimate determination of the suppression of evidence is a legal question requiring independent appellate review." ' [Citations omitted.]"

It has further been said that "[w]hen the facts material to a decision of the court on a motion to suppress evidence are not in dispute, the question of whether to suppress is a question of law over which this court has unlimited review. [Citation omitted.]" *State v. Jones*, 270 Kan. 526, 527, 17 P.3d 359 (2001). The facts in this case are not in dispute.

Finally, because the interpretation of the provisions of a statute is involved in the first issue, this is a question of law over which our court's review is unlimited. *State v. Engles*, 270 Kan. 530, 532, 17 P.3d 355 (2001).

In framing his first issue, Samuel admits in his petition for review that he is not claiming it was improper for the officers to drive Roberto home. It is their entry into his apartment which he objects to. He contends the Court of Appeals majority's characterization of the Lenexa officers' actions as "informal" is incorrect and ignores the statutory limits of Johnson County law enforcement officers. Samuel argues that the entry of the Lenexa officers into his apartment was investigatory.

The Court of Appeals dissent stated: "When Roberto entered the apartment, that should have been the end of the officers' involvement." The Court of Appeals majority stated: "The officers' role in returning Roberto to the apartment was an informal one. Owsley testified the officers were not doing so out of any investi-

gatory purpose. It would be ridiculous to require the officers to drop off a 16-year-old boy at the Lenexa city limits because they no longer had statutory authority to drive him home."

The State first cites numerous statutory provisions from K.S.A. Chapter 22, Article 24 relating to arrests and suggests Owsley could have made a citizen's arrest under K.S.A. 2002 Supp. 22-2403(2) when he saw the marijuana. It is further argued the officers were not exercising their power as law enforcement officers, and even if a criminal procedure statute was violated, it was not a Fourth Amendment violation which would require the evidence obtained to be suppressed, citing *State v. Harris,* 26 Kan. App. 2d 42, 50-51, 975 P.2d 1228, *rev. denied* 267 Kan. 890, *cert. denied* 528 U.S. 957 (1999).

With these contentions of the parties in mind, we first set forth the applicable statutes.

K.S.A. 2002 Supp. 22-2401a, in applicable part, states:

"(2) Law enforcement officers employed by any city may exercise their powers as law enforcement officers:

(a) Anywhere within the city limits of the city employing them and outside of such city when on property owned or under the control of such city; and

(b) in any other place when a request for assistance has been made by law enforcement officers from that place or when in fresh pursuit of a person.
. . . .

"(4) In addition to the areas where law enforcement officers may exercise their powers pursuant to subsection (2), law enforcement officers of any jurisdiction within Johnson or Sedgwick county may exercise their powers as law enforcement officers in any area within the respective county when executing a valid arrest warrant or search warrant, to the extent necessary to execute such warrants.
. . . .

"(6) In addition to the areas where law enforcement officers may exercise their powers pursuant to subsection (2), law enforcement officers of any jurisdiction within Johnson county may exercise their powers as law enforcement officers in any adjoining city within Johnson county when any crime, including a traffic infraction, has been or is being committed by a person in view of the law enforcement officer. A law enforcement officers shall be considered to be exercising such officer's powers pursuant to subsection (2), when such officer is responding to the scene of a crime, even if such officer exits the city limits of the city employing the officer and further reenters the city limits of the city employing the officer to respond to such scene.

"(7) As used in this section:

(a) 'Law enforcement officer' has the meaning ascribed thereto in K.S.A. 22-2202 and amendments thereto."

K.S.A. 22-2202(13) defines a law enforcement officer as

"any person who by virtue of office or public employment is vested by law with a duty to maintain public order or to make arrests for violation of the laws of the state of Kansas or ordinances of any municipality thereof or with a duty to maintain or assert custody or supervision over persons accused or convicted of crime, . . . *while acting within the scope of their authority.*" (Emphasis added.)

Samuel's reliance on *State v. Sodders*, 255 Kan. 79, 872 P.2d 736 (1994), as strictly limiting the jurisdiction of city police officers must recognize the precise *Sodders* issue and the actions of the 1994 Kansas Legislature in amending K.S.A. 22-2401a(4). In *Sodders*, Overland Park detectives obtained a search warrant on the apartment of the defendant which was located in the city of Lenexa. Assistance was requested from the Lenexa Police Department, which dispatched three officers who provided security but did not participate in the search. K.S.A. 22-2401a was construed to control over the provisions of K.S.A. 22-2505 relating to the execution of search warrants. The *Sodders* majority held that neither of the two exceptions to K.S.A. 22-2401a(2)(b) applied. 255 Kan. at 82-84. The request for assistance had not been made by Lenexa police and the "when in fresh pursuit of a person" exception was not applicable. The Overland Park officers were held to have no authority to execute the search warrant in Lenexa. 255 Kan. at 83-84.

However, the effect of the *Sodders* opinion was short lived. *Sodders* was filed on April 15, 1994, and the Kansas Legislature on April 25, 1994, enacted Senate Bill 742, which amended K.S.A. 22-2401a(4) as follows:

"(4) In addition to the areas where law enforcement officers may exercise their powers pursuant to subsection (2), law enforcement officers of any jurisdiction within ~~a county designated an urban area by K.S.A. 19-3524 and amendments thereto~~ *Johnson or Sedgwick county* may exercise their powers as law enforcement officers in any area within ~~such~~ *the respective* county when executing a valid arrest ~~warrant~~ *or search warrant,* to the extent necessary to execute such ~~warrant~~ *warrants.*" L. 1994, ch. 286, sec. 1.

Under this amendment, which was effective upon publication of the statute book, execution of a search or arrest warrant by the Overland Park officers in the city of Lenexa is now clearly authorized. Three justices would have reached the same result in the *Sodders* case but for the reasons set forth in two lengthy dissents which we need not here discuss. See 255 Kan. at 85-100.

The 1994 legislative amendment relates only to execution of arrest and search warrants by expansion of the jurisdictional rights of Johnson County law enforcement officers. It obviously does not relate directly to the facts of our case but indicates an expansion rather than a restriction of city police jurisdictional rights by our legislature.

It is clear the Lenexa police officers were not in fresh pursuit, nor had they received a request for assistance, so neither of the K.S.A. 2002 Supp. 22-2401a(1)(b) grants of jurisdiction applies in this case.

However, the language of K.S.A. 2002 Supp. 22-2401a(6) appears to evidence a legislative intent to give expanded jurisdiction to a Johnson County law enforcement officer "when any crime, *including a traffic infraction*, has been or is being committed by a person in view of the law enforcement officer." (Emphasis added.) In this case, Roberto had clearly been driving a vehicle with an expired tag and without proof of insurance, both having been committed in view of the Lenexa police officers. While this language may have been intended to allow Lenexa officers to exercise their powers in Overland Park if they viewed a traffic infraction, it is also subject to being construed to grant the Lenexa officers here the right to exercise their "powers as law enforcement officers in any adjoining city within Johnson County" while concluding the transporting of Roberto to his residence.

As the Court of Appeals majority opinion suggested: "[i]t would be ridiculous to require the officers to drop off a 16-year-old boy at the Lenexa city limits because they no longer had statutory authority to drive him home." In his petition for review, Roberto makes no objection to the right of the Lenexa officers to drive him home, and we hold they properly did so as law enforcement officers

"acting within the scope of their authority" under K.S.A. 22-2202(13) and as allowed by K.S.A. 2002 Supp. 22-2401a(6).

The Lenexa officers did not cease being law enforcement officers at any time during the facts of this case. The State's argument that they acted as private citizens is rejected. Samuel's arguments that a jurisdictional infirmity should be the basis for granting his motion to suppress are likewise rejected.

This result then centers our decision on the Lenexa officers' actions involving their entry into Samuel's residence. We must decide whether the officers' entry violated Samuel's constitutional rights to be free of unlawful searches and seizures.

There is no question but that Samuel had a personal expectation of privacy in the area searched. It was his residence. He has standing to challenge the actions of the Lenexa police officers. See *State v. Worrell*, 233 Kan. 968, 969-70, 666 P.2d 703 (1983).

Samuel contends search and seizure violations occurred under both the United States and Kansas Constitutions. We recently recognized the sameness of the protections which are afforded in *State v. Ninci*, 262 Kan. 21, 29-30, 936 P.2d 1364 (1997), where Justice Abbott stated:

"The Fourth Amendment to the United States Constitution provides:

'The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.'

"Section 15 of the Kansas Constitution Bill of Rights provides:

'The right of the people to be secure in their persons and property against unreasonable searches and seizures, shall be inviolate; and no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched and the persons or property to be seized.'

"Section 15 of the Kansas Constitution Bill of Rights provides protection identical to that provided under the Fourth Amendment to the United States Constitution. See *State v. Johnson*, 253 Kan. 356, 362, 856 P.2d 134 (1993) ('[T]he wording and scope of the two sections are identical for all practical purposes. If conduct is prohibited by one it is prohibited by the other.'); *State v. Schultz*, 252 Kan. 819, 824, 850 P.2d 818 (1993)."

It is a well-recognized rule that unreasonable searches and seizures are constitutionally prohibited and "[u]nless a search falls

within one of a few exceptions, a warrantless search is per se unreasonable." *State v. Canaan*, 265 Kan. 835, Syl. ¶ 1, 964 P.2d 681 (1998). We further said in *Canaan* that "[t]he exclusionary rule prohibits the admissions of the 'fruits' of illegally seized evidence, *i.e.*, any information, object, or testimony uncovered or obtained, directly or indirectly, as a result of the illegally seized evidence or any leads obtained therefrom" 265 Kan. 835, Syl. ¶ 3.

There are several recognized exceptions to the Fourth Amendment requirement of a lawfully issued search warrant. Most of these are set forth in *State v. Baughman*, 29 Kan. App. 2d 812, 814, 32 P.3d 199 (2001), where Judge Beier opined:

"Kansas has previously recognized several exceptions to the Fourth Amendment search warrant requirement: consent; search incident to a lawful arrest; stop and frisk; probably cause to search accompanied by exigent circumstances, of which hot pursuit is one example; the emergency doctrine; inventory searches; plain view; and administrative searches of closely regulated businesses. See *Canaan*, 265 Kan. at 843 (inventory search of impounded automobile; plain view); *State v. Box* 28 Kan. App. 2d 401, 404, 17 P.3d 386 (2000) (citing *State v. Sanders*, 5 Kan. App. 2d 189, 195, 614 P.2d 998 [1980]) (consent, search incident to arrest, stop and frisk, exigent circumstances, hot pursuit); *State v. Jones* 24 Kan. App. 2d 405, 410-12, 947 P.2d 1030 (1997) (emergency doctrine recognized in *State v. Jones*, 2 Kan. App. 2d 38, 573 P.2d 1134 [1978]; *State v. Marsh*, 16 Kan. App. 2d 377, 381-87, 823 P.2d 823 (1991) (citing as controlling *New York v. Burger*, 482 U.S. 691, 702-03, 711-12, 96 L. Ed. 2d 601, 107 S. Ct. 2636 [1987]); see also *Steagald v. United States*, 451 U.S. 204, 218, 68 L. Ed. 2d 38, 101 S. Ct. 1642 (1981) (recognizing hot pursuit exception as one example of exigent circumstances exception); *State v. Riddle*, 246 Kan. 277, 280, 788 P.2d 266 (1990) (same)."

Another exception is the "plain feel" corollary to the plain view exception to the Fourth Amendment search warrant requirement which we adopted in *State v. Wonders*, 263 Kan. 582, Syl. ¶ 7, 952 P.2d 1351 (1998).

The arguments of the parties are predictable. Samuel contends that neither consent, exigent circumstances, nor the emergency doctrine exceptions are applicable under the uncontroverted facts of the case.

The State argues discovery of the marijuana fell under the plain view exception, was properly viewed under a law enforcement "community caretaking function" as a part of the emergency ex-

ception, and was "reasonable" under all the facts and circumstances.

In upholding the denial of the motion to suppress, the Court of Appeals' majority concluded its opinion by stating: "We conclude that the officers acted reasonably and within the emergency exception in rendering aid and assistance to Roberto." In contrast, the dissent opined that both *State v. Jones*, 24 Kan. App. 2d 405, 947 P.2d 1030 (1997), and *Baughman* were factually different, there was no request for help, no fear for anyone's safety or good faith belief that someone inside the apartment needed immediate aid or assistance, and the emergency doctrine simply did not apply to the facts of this case.

The State's plain view argument is without merit as the officers both testified they could not see inside Samuel's apartment before they made their uninvited entry. It was the entry which is the issue in this case, and there was nothing in the officers' view while outside the apartment.

The Lenexa police officers' actions may not be justified by the State's argument that they were "reasonable." We agree with the discussion of "reasonableness" set forth by Judge Beier in *Baughman*, 29 Kan. App. 2d at 815:

"Although our appellate courts also frequently refer generally to 'reasonableness' as the guiding principle of Fourth Amendment analysis, see, *e.g., In re L.A.*, 270 Kan. 879, 21 P.3d 952 (2001) (citing *New Jersey v. T.L.O.*, 469 U.S. 325, 340, 83 L. Ed. 2d 720, 105 S. Ct. 733 [1985]); *State v. Jones*, 27 Kan. App. 2d 476, 479, 5 P.3d 1012 (2000), *affd.* 270 Kan. 526, 17 P.3d 359 (2001), we do not interpret these references as a license to ignore or discount the recognized exceptions to the warrant requirement. Rather, we think it wise to avoid 'the wild card of general reasonableness' as the rationale for our decisions in Fourth Amendment cases. See *Alaska v. Myers*, 601 P.2d 239, 245-46 (Alaska 1979) (Boochever, C.J., dissenting) (vague 'reasonableness' standard; 'leave it to the officer on the beat . . . [and] the trial judge' to make an unguided determination); see also *Bute*, 43 F.3d at 534-35 (precedent 'neither establishes nor condones application of an amorphous "reasonableness" test' to determine constitutionality of warrantless search; clearly defined exception to warrant requirement must apply). A vague standard resting only on an individual judge's or an individual law enforcement officer's idea of what is 'reasonable' in any of myriad combinations of circumstances is bound ultimately to yield inconsistent, and consequently unfair, results."

For a similar holding, see *United States v. Bute*, 43 F.3d 531, 534-35 (10th Cir. 1994), where it was said:

"[T]he precedent of the Supreme Court and this circuit is quite clear that a warrantless search is reasonable only when it falls within one of the clearly defined exceptions to the warrant requirement. See [*Florida* v.] *Jimeno* 500 U.S. [248] at 250-51, [114 L. Ed. 2d 297,] 111 S. Ct. at 1803 [1991]. As such, precedent neither establishes nor condones application of an amorphous 'reasonableness' test to determine the constitutionality of a warrantless search."

This then leads us to the emergency doctrine exception, which was the basis for the decisions of the courts below.

The emergency doctrine exception to the search warrant requirement has been discussed in Kansas through three primary Court of Appeals cases. *State v. Jones*, 2 Kan. App. 2d 38, 573 P.2d 1134 (1978) (*Jones I*); *State v. Jones*, 24 Kan. App. 2d 405 (*Jones II*), and *State v. Baughman*, 29 Kan. App. 2d 812. The defendants in the two *Jones* cases were different individuals, and we will refer to them as *Jones I* and as *Jones II*. A case recently ordered published, *State v. Blair*, 31 Kan. App. 2d 202, 62 P.3d 661 (2002), also discussed the emergency doctrine but had consent and probable cause issues as well.

We will limit our discussion here to the three primary Kansas cases, but the emergency doctrine is more fully discussed in 3 La Fave, Search and Seizure § 6.6 (3d ed. 1996), and in the following law reviews: Note, *The Emergency Doctrine, Civil Search and Seizure, and the Fourth Amendment*, 43 Ford. L. Rev. 571 (1975), and Mascolo, *The Emergency Doctrine Exception to the Warrant Requirement Under the Fourth Amendment*, 22 Buf. L. Rev. 419 (1973). We will also briefly discuss the *Blair* decision later, but it was not considered by the courts below.

In *Jones I*, police responding to an apartment fire removed a smoldering rug. When they reentered the apartment to look for occupants and to clear the apartment of smoke, they found drug paraphernalia and partially smoked marijuana cigarettes. After the apartment occupant was charged with marijuana possession, a motion to suppress was granted. The Court of Appeals reversed and, after citing a plain view case, *State v. Schur*, 217 Kan. 741, 538 P.2d 689 (1975), opined:

"Among the well-established 'legitimate reasons' for a police officer to be present on privately occupied premises is in response to an emergency. See *Vale v. Louisiana*, 399 U.S. 30, 35, 26 L. Ed. 2d 409, 90 S. Ct. 1969 [1970]; *Wayne v. United States*, 318 F.2d 205 (D.C. Cir. 1963); *State v. Boyle*, 207 Kan. 833, 486 P.2d 849 [1971]. In *Wayne*, the 'emergency doctrine' was well described by then Circuit Judge Warren Burger:

' . . . [A] warrant is not required to break down a door to enter a burning home to rescue occupants or extinguish a fire, to prevent a shooting or to bring emergency aid to an injured person. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency . . . .' (318 F.2d at 212.)

"In *Boyle*, the Kansas Supreme Court stated:

'Where "exigent circumstances" . . . exist the business of policemen is to act, not to speculate or meditate on whether the report is correct. People could well die in emergencies if police tried to act with the calm deliberation associated with judicial process . . . .' (207 Kan. at 839.)

. . . .

"Unlike *Schur* in which contraband was viewed prior to a valid entry, the facts in the case at bar fit squarely within the concerns of the emergency doctrine. The officers responded to a fire call. Upon arrival at the scene, they forcibly entered the apartment in order to save property and possibly to save lives. The initial intrusion was lawful." 2 Kan. App. 2d at 41-42.

The facts in *Jones II* involved a police check of the parents' concern for the welfare of their son Tony, who had not shown up for dinner several days earlier as planned, was not answering phone calls or returning calls as he usually did, and had recently met someone he seemed to fear. Several police officers and the parents went to Tony's apartment and after knocking on the door and calling for Tony were admitted into the apartment by an employee who had the manager's permission to open Tony's door if the need arose.

Once inside the apartment, a man and woman were found lying on the couch under a blanket. The man indicated he was not Tony and had no idea where Tony was or when he would return. The law enforcement officers saw a pipe on a coffee table which the man admitted was used to smoke crack. After determining the identity of the man to be David Lee Jones, the police learned of an outstanding warrant and he was placed under arrest. Upon

searching through Jones' clothing before handing them to him, they found a vial of white powder residue. Testing revealed cocaine on the crack pipe and in the vial.

At a suppression hearing, Jones argued the parents' concern did not justify a warrantless entry into the son's apartment. Jones' usage of the apartment was with Tony's consent. The State countered by asserting the emergency doctrine exception to the warrant requirement recognized in *Mincy v. Arizona*, 437 U.S. 385, 57 L. Ed. 2d 290, 98 S. Ct. 2408 (1978), and in *People v. Mitchell*, 39 N.Y.2d 173, 383 N.Y.S.2d 246, 347 N.E.2d 607 (1976). Standing was found, the emergency doctrine was applied, and the suppression motion was denied. This ruling was affirmed on appeal in *Jones II*. 24 Kan. App. 2d at 409-17.

The *Jones II* opinion suggested that *State v. Boyle*, 207 Kan. 833, 486 P.2d 849 (1971), was not really an emergency doctrine case because there were two independent grounds to justify the warrantless search—consent and probable cause, coupled with exigent circumstances. 24 Kan. App. 2d at 411-12. The *Jones II* opinion then set forth the three-part test of *Mitchell* to provide guidance on how to analyze fact situations under the emergency doctrine exception:

" '(1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property.

" '(2) The search must not be primarily motivated by intent to arrest and seize evidence.

" '(3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.' 39 N.Y.2d at 177-78." *Jones*, 24 Kan. App. 2d at 413.

The *Jones II* opinion explained the difference between the exigent circumstances exception and the emergency exception by setting forth the following quote from *State v. Fisher*, 141 Ariz. 227, 240-41, 686 P.2d 750, *cert. denied* 469 U.S. 1066 (1984).

" 'The exigent circumstances exception is triggered when the police, with probable cause but no warrant, enter a dwelling in the reasonable belief that the delay necessary to obtain a warrant threatens the destruction of evidence, [citations omitted], or when they have a reasonable belief that a crime is in progress or has

just been committed in a dwelling and the delay attendant to obtaining a warrant endangers the safety or life of a person therein. [Citations omitted.] . . . .'

" 'Conversely, the emergency aid doctrine is triggered when the police enter a dwelling in the reasonable, good-faith belief that there is someone within in need of immediate aid or assistance. In cases in which this doctrine applies there is no probable cause which would justify issuance of a search warrant, . . ., and the police are not entering to arrest, search, or gather evidence.' " 24 Kan. App. 2d at 414.

*Jones II* cited cases from several other jurisdictions but recognizes that the facts in each emergency doctrine case are unique. The opinion recognized that "police are often forced to make judgment calls under circumstances where it is better to err on the side of safety. The fact that Tony was not discovered in need of help in his apartment is of no relevance. See 3 La Fave, Search and Seizure § 6.6(a), p. 392." 24 Kan. App. 2d at 416.

The *Jones II* opinion concluded that all three prongs of the *Mitchell* test were satisfied but suggests that if the police actions appear to be reasonable under the circumstance further analysis would be unnecessary. 24 Kan. App. 2d at 417. It thus appears that while the emergency doctrine exception was the basis for the *Jones II* decision, a "reasonableness" analysis was, in part, utilized.

We have previously quoted herein excerpts from the *Baughman* opinion. The facts there are more straightforward than *Jones II* or our case. Law enforcement officers entered Baughman's business building about 3:30 a.m., prompted by an open exterior door and a light inside. Suspecting a burglary in process, the owner was not called and the officers discovered marijuana growing in the building.

The *Baughman* opinion looked at decisions from Alaska, California, and Illinois where nighttime entries into commercial properties for security purposes were approved but said:

"[W]e . . . are not persuaded that recognition of a new 'wholesale exception' to the warrant requirement for nighttime checks of commercial buildings is necessary or wise. We hold, however, that the particular warrantless entry and ensuing search at issue here were permissible under the emergency doctrine previously recognized and applied in Kansas." 29 Kan. App. 2d at 819.

*Baughman* discussed both *Jones I* and *Jones II* and held the officers' actions satisfied all three prongs of the *Mitchell* test pre-

viously set forth herein. The opinion concluded: "The officers were engaged in exactly such a 'community caretaking function' when they entered Baughman's business, and it was reasonable to behave as they did. There was no violation of Baughman's Fourth Amendment right to justify suppression of the evidence ultimately seized." 29 Kan. App. 2d at 820.

In *Blair*, officers went to a residence to investigate a Crimestoppers' call about the odor of ether. When approaching the residence, the officers saw a gray cloud coming out from under the garage door and could smell ether in the air. Blair refused the officers' request to investigate and examine the garage. Based on their training, the officers suspected the manufacturing of methamphetamine in the garage.

After entering the residence without consent or a search warrant, the officers found items used to make methamphetamine in both the kitchen and the garage. They arrested Blair and contacted the drug task force to secure the house and obtain a search warrant.

The trial court denied the suppression motion. The Court of Appeals reversed and held the motion to suppress should have been granted. 31 Kan. App. 2d at 210.

The *Blair* opinion suggested the officers could have attempted to obtain a search warrant. 31 Kan. App. 2d at 207. As to the State's contention that the emergency doctrine applied, *Jones II* was cited and the three-prong test of *Mitchell* was set forth. 31 Kan. App. 2d at 208. It was then held that because the primary motive for the search was to obtain evidence in the garage, the second prong of *Mitchell* ("the search must not be primarily motivated by intent to arrest and seize evidence") was violated and the emergency doctrine did not apply. 31 Kan. App. 2d at 209.

In both *Jones I* and *Jones II*, there was either an actual emergency (fire in *Jones I*) or a perceived emergency in (parental concern over son's well being in *Jones II*). In our case, Officer Owsley clearly admitted that no emergency existed. He answered negatively to the following questions during his cross-examination at the suppression hearing:

"Q. And at the time you entered into the apartment, you were not responding to any kind of emergency, were you?

"A. No, we were not.

"Q. And no emergency had been reported to you at the apartment, right?

"A. Correct."

Both *Jones I* and *Jones II* involved a warrantless entry into a residence. Here, in the absence of facts which either suggest or clearly show an emergency, plus the testimony of a law enforcement officer stating they were not responding to an emergency, we are hard pressed to find that the requisite emergency existed.

The *Baughman* holding is simply not applicable to our case. The entry there was prompted by an open door to a lighted commercial building after business hours. This is clearly different than our uninvited, unannounced entry into a residence by following behind an individual who resided there. We do not, however, challenge *Baughman's* observation that an amorphous "reasonableness test" to determine the constitutionality of warrantless searches are bound to yield inconsistent and ultimately unfair results. See 29 Kan. App. 2d at 815.

When we analyze our facts under the three-part test of *Mitchell*, which was adopted in *Jones II*, the search fails under the first and third prongs:

Under the first prong, the police did *not* have reasonable grounds to believe that an emergency was at hand or that an immediate need existed for their assistance to protect Roberto or the occupants of the residence. Roberto identified where he resided and walked directly to the correct apartment. He had identified his brother's car and the officers had confirmed that it was owned by Samuel Mendez. Roberto called out to his brother as he prepared to enter the apartment. The officers could easily have confirmed Roberto's right of entry by waiting at the door for confirmation of this fact from a resident therein. This would also have confirmed that no party therein needed aid or assistance. The only troubling factors were Roberto's age and the failure of phone calls to be answered.

Under the third prong, there does *not* appear to be any reasonable basis approximating probable cause to connect the police actions with a search of Samuel's residence. With the officers' con-

cerns about Roberto not rising to an emergency level, it was not necessary for the officers to enter the apartment to satisfy the existing situation.

The second prong of the *Mitchell* test *was* satisfied as the search was inadvertent and not motivated by an intent to arrest and seize evidence.

The dissent in the Court of Appeals makes an excellent point in observing that "no one requested help from Officers Owsley and Schmitz. There was no fear for someone's safety or a good faith belief that someone inside needed immediate aid and assistance. Officer Owsley testified they did not enter the apartment out of concern for the occupants' welfare."

Ultimately, search and seizure cases are all fact sensitive and determinative. We are not prepared to hold that there will never be instances where law enforcement officers' community caretaking actions will justify the application of the emergency doctrine exception to the search warrant requirement. We simply hold that its application is not justified under the facts of this case.

Without invitation, consent, or necessity for entry and under all of the facts of this case, the balance must be struck in favor of Samuel to be secure in his home against an unreasonable search and seizure.

The judgment of the Court of Appeals is affirmed in part and reversed in part. The district court's denial of the motion to suppress is reversed and the matter is remanded to the district court.

ABBOTT and GERNON, JJ., not participating.

LARSON, S.J., AND WAHL, S.J., assigned.■