# In the

# United States Court of Appeals

## For the Seventh Circuit

————————————

No. 07-2077

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TERRY L. REED,

*Defendant-Appellant.*

————————————

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 06 CR 75—**Robert L. Miller, Jr.**, *Chief Judge.*

————————————

ARGUED FEBRUARY 14, 2008—DECIDED AUGUST 20, 2008

————————————

Before MANION, ROVNER, and WILLIAMS, *Circuit Judges.*

MANION, *Circuit Judge.* During interrogation by police, Terry Reed claimed he had no authority to permit a search of a dwelling he apparently shared with his girlfriend. After he was arrested on an outstanding warrant, his girlfriend consented to a search that produced a weapon and drugs. Reed was convicted by a jury of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and being a drug user in possession of a firearm

in violation of 18 U.S.C. § 922(g)(3). Reed appeals the district court's denial of his motion to suppress, claiming that the search violated the Supreme Court's holding in *Georgia v. Randolph*, 126 S.Ct. 1515 (2006). He also challenges the district court's rejection of a proposed jury instruction. We affirm.

## I.

On March 27, 2006, while patrolling in an unmarked police vehicle, Corporal Scott Severns of the South Bend, Indiana, Police Department spotted a black Cadillac Escalade driven by Terry Reed. Severns recognized Reed from an earlier investigation during which undercover officers had purchased crack cocaine at 4009 Bonfield Place in South Bend. Severns also knew that Reed had a suspended driver's license and an outstanding warrant. Because he was in an unmarked car, Severns radioed for a marked car to stop Reed. Corporal Michael Ingle responded to the call and stopped the Escalade. Reed exited the vehicle and was arrested. During the pat-down of Reed, Ingle discovered a baggie containing crack cocaine and over $5,000 in cash in Reed's pockets.

After reading Reed his *Miranda* rights, Severns conducted a recorded interview at the scene of the stop. During the interview, Reed stated that the cocaine that Ingles found was for Reed's personal use. Reed also told Severns that he lived at 1805 Sample Street in South Bend and that he had multiple prior felony convictions. Severns told Reed that police had information that Reed had guns at 4009 Bonfield Place and asked Reed if he lived there.

Reed responded that he only visited there but he gave his girlfriend money to pay the rent there. As for the guns, Reed said that he was not aware of any guns and that he did not own any guns because of his felony convictions. When Severns inquired whether Reed would sign a consent to search form for 4009 Bonfield, Reed responded, "Naw, it's not my place. I can't give you permission for that." Thereafter, Reed was taken to jail.

While Severns was interviewing Reed, Johanna Foster, Reed's girlfriend, drove up to the scene and spoke with the officers. Severns also conducted a taped interview of Foster. Foster informed him that she lived at Alonzo Watson Drive, but stayed with Reed at 4009 Bonfield. Foster also stated that the lease for 4009 Bonfield was in both her and Reed's names. When Severns inquired whether there were any guns at the residence, Foster responded that she thought that there were two guns that belonged to Reed's friend. When Severns asked Foster if the police could search the house, Foster responded, "If I go with them and they promise not to tear it up." The police and Foster drove to 4009 Bonfield, and after consulting her sister and an attorney, Foster signed the consent form.

During the course of the search of 4009 Bonfield, officers found a Lorcin .380 caliber handgun and a Smith and Wesson .38 caliber special revolver in the bedroom closet. Also in the bedroom, the officers located a small amount of crack cocaine on top of a television set and documents addressed to Reed (with the Sample Street address). The officers found a box of .38 special ammunition there as

well. Tests later revealed that a fingerprint on one of the guns belonged to Reed.

In a two-count indictment, Reed was charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and being a drug user in possession of a firearm in violation of 18 U.S.C. § 922(g)(3). Citing *Georgia v. Randolph*, 126 S. Ct. 1515 (2006), Reed moved to suppress the evidence acquired during the search of 4009 Bonfield. After conducting a hearing, the district court denied Reed's motion. It concluded that Reed's case was distinct from the scenario in *Randolph* and that consent to search was validly obtained to search 4009 Bonfield.

Reed pleaded guilty to the felon in possession of a firearm charge, but later withdrew his plea and proceeded to trial. At trial, Reed testified that he had touched the guns, but he had thought that they were toys. Reed stated that he immediately returned the bag in which the guns were located to the closet shelf once he saw what appeared to him to be ammunition. Outside of the presence of the jury, Reed submitted to the district court the following proposed jury instruction: "The mere presence of a finger-print on a firearm is insufficient to prove possession of a firearm beyond a reasonable doubt." The district court rejected this submission, concluding that it was "unneces-sary and overstatement of the law." The district court further noted, that "[c]ounsel are free to argue the issue of sufficiency without further instruction." The jury returned a verdict of guilty on both counts, and Reed was sentenced to 262 months' imprisonment. Reed now appeals the denial of his motion to suppress and the district court's rejection of his proposed jury instruction.

## II.

We review questions of law de novo and findings of fact for clear error when reviewing a district court's denial of a motion to suppress. *United States v. Hagenow*, 423 F.3d 638, 641-42 (7th Cir. 2005).

Reed contends that the evidence seized during the search of 4009 Bonfield should be suppressed pursuant to *Georgia v. Randolph*, 126 S. Ct. 1515 (2006). In *Randolph*, the Supreme Court held that a stated refusal to permit entry by a physically present co-occupant prevails over the consent to search by the other co-occupant, rendering the warrantless search unreasonable and invalid as it affects the non-consenting co-occupant. 126 S. Ct. at 1519. Both the defendant in *Randolph* and his estranged wife were at the threshold of the residence when police arrived. The officers first asked Randolph for consent to search; after he objected, the officers turned to his wife, who consented. In deciding *Randolph*, the Court carefully distinguished and preserved the holdings in two earlier Supreme Court cases involving challenges to the consent to search a defendant's residence. In *United States v. Matlock*, 415 U.S. 164 (1974), the defendant was in a squad car near his dwelling but was not given the opportunity to object to the search. In *Illinois v. Rodriguez*, 497 U.S. 177 (1990), the defendant was asleep in the residence but was not given a chance to object to a search. In both cases the Court held that consent to search by a co-occupant of the premises was valid. In *Randolph*, the Court stated that the "fine line" it was drawing was this: "if a potential defen-dant with self-interest in objecting is in fact at the door and

objects, the co-tenant's permission does not suffice . . . whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out." *Randolph*, 126 S. Ct. at 1527. The Court, however, continued qualifying this "fine line" by stating that it stands "[s]o long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection." *Id.*

As the district court properly concluded, Reed's case does not fall within the ambit of *Randolph*. First, Reed was absent from the residence at the time Foster consented and the search was conducted. Reed's absence was a result of a valid arrest, and the police did not execute the arrest for the purpose of removing Reed from the area when the police obtained Foster's consent. *See United States v. Wilburn*, 473 F.3d 742, 745 (7th Cir. 2007) (concluding that the case did not fall within the narrow line of *Randolph* where the defendant was not physically present when consent was obtained and he was not removed "from the area to avoid hearing him invoke an objection to the search"). *See also United States v. DiModica*, 468 F.3d 495, 499 (7th Cir. 2006) (concluding that there was no Fourth Amendment violation where consent to search was obtained from a wife after her husband was removed from the home during the course of a valid arrest); *United States v. Parker*, 469 F.3d 1074, 1078-79 (7th Cir. 2006) (holding that the co-tenant's consent to search a house was independent of defendant's arrest). Further, it is clear from the record that Foster voluntarily consented to the search of 4009 Bonfield, as evinced by her consultation with her sister and an attorney.

Moreover, had Reed been standing in the doorway and refused to consent to a search because it was not his place, only to be overridden by Foster's subsequent consent, we might have a closer question under *Randolph*. But we need not answer that question because unlike the defendant in *Randolph*, Reed was not present at the searched residence. Reed cites *United States v. Ellis*, 499 F.3d 686 (7th Cir. 2007), in support of his position that his statement was a refusal binding the officers not to search. However, Reed's case is distinct from *Ellis*. The defendant in *Ellis* stood at the door and stated a decisive "no" to the officers' request to search a home before stating that he did not live in the house. *Id.* at 688, 690. Reed, however, was away from the home and responded to Severns's request to sign a form giving the officers consent to search "your place over on Bonfield." Reed responded, "Naw, it's not my place[;] I can't give you permission for that." Unlike the defendant in *Ellis*, Reed was not present at the threshold of the home. In fact, he was not near the location when police stopped his car and arrested him. Therefore, in light of Reed's absence from 4009 Bonfield, we conclude that the district court did not err in holding that the suppression of evidence was not warranted under *Randolph*.

Reed also challenges the district court's rejection of one of his proposed jury instructions, arguing that the rejection denied him a fair trial. "We review a district court's decision not to instruct the jury on a theory of defense de novo." *United States v. Hendricks*, 319 F.3d 993, 1004 (7th Cir. 2003). Considering the jury instructions as a whole, a defendant is not entitled to a specific instruction if a jury

was adequately instructed on a defendant's theory of defense. *United States v. Given*, 164 F.3d 389, 394 (7th Cir. 1999).

The proposed instruction the district court rejected stated, "The mere presence of a fingerprint on a firearm is insufficient to prove possession of a firearm beyond a reasonable doubt." The district court submitted to the jury the instruction that the government must prove, among other things, that Reed knowingly possessed a firearm, and that:

> The word "knowingly" means that the defendant realized what he was doing and was aware of the nature of his conduct and did not act through ignorance, *mistake* or *accident*. Knowledge may be proved by the defendant's conduct and by all the facts and circumstances surrounding the case.

> Possession of an object is the ability to control it. Possession may exist even when a person is not in physical contact with the object, but knowingly has the power and intention to exercise direction and control over it, either directly or through others.

(Emphasis added.)

We conclude that viewing the instructions as a whole, the district court did not err in denying Reed's request for the specific instruction. The provided instruction clearly sets forth that possession must be knowing and that possession is not achieved by accident. Thus, the instruction given encompassed Reed's theory of the case that he accidentally came in contact with the guns. Furthermore,

the district court permitted Reed's counsel to assert his theory regarding sufficiency during closing argument. Reed's attorney took advantage of this opportunity by stating that Reed was not charged with touching a firearm and asserted that Reed coming in contact with the guns was an accident caused by Reed's mistaken belief that the gun was a toy. Accordingly, the district court did not err in rejecting Reed's proposed jury instruction.

## III.

The police officers' search of 4009 Bonfield did not violate the principles set forth in *Randolph*, and therefore the district court properly denied Reed's motion to suppress. Regarding the jury instructions, the district court did not err in denying Reed's proposed instruction because the instruction given properly informed the jury of the controlling law and instructed the jury on Reed's theory of defense. Accordingly, we AFFIRM.

ROVNER, *Circuit Judge*, concurring. I agree both with the result and the bulk of the reasoning in this majority opinion. I object only to the statement that a valid arrest eviscerates a resident's objection to an officer's request to search made while that resident was present on the property.

In my recent dissent in *United States v. Henderson*, No. 07-1014, 2008 WL 3009968 (7th Cir. Aug. 6, 2008) (Rovner, J., dissenting), I argued that "where the police are responsible for the objecting tenant's removal from the premises, his objection ought to be treated as a continuing one that trumps his co-tenant's consent and so precludes a search of the premises unless and until the police obtain a warrant." *Id.* at *10. My conclusion rested on the essential expectation of residential privacy protected by the Fourth Amendment, and specifically, on the social expectations paradigm upon which the Supreme Court relied in its decision in *Georgia v. Randolph*, 547 U.S. 103, 126 S. Ct. 1515 (2006). "Only in a Hobbesian world," I wrote, "would one person's obligation to another [to obey the command to keep out] be limited to what the other is present and able to enforce." *Henderson,* 2008 WL 3009968, at *11 (Rovner, J., dissenting)

On the flip side of this theory, once a tenant chooses to share access to the premises with another person and then leaves the premises voluntarily, that resident assumes the risk that a co-tenant may admit an objectionable person into the residence. *Henderson*, 2008 WL 3009968, at *11 (Rovner, J., dissenting). Under this reasoning, a court must consider not whether the resident was removed pursuant to a valid arrest, but whether the objecting resident was removed involuntarily or whether he abandoned the premises of his own volition. In this case, however, we need not be bothered with such a determination. Reed was never removed from the premises, nor was he present at the address when he said "Naw, it's not my place. I can't give you permission for that." He was sitting in his car on the side of the road. He was not, therefore, a

present and objecting tenant. Consequently, in sustaining the search, I would go no further than noting that Reed was absent from the premises when his girlfriend, who was present at the residence and had authority to consent, gave the okay for the search.